# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |  |
|---|---|
| AHMED ELSHAZLI, <br><br> Plaintiff, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> Defendants. | Case No. 1:19-cv-01831 (TNM) |

## MEMORANDUM OPINION

Ahmed Elshazli has sued the D.C. Government and two of its police officers for alleged misconduct relating to his recent arrest. He brought claims under 28 U.S.C. § 1983 against Metropolitan Police Officers John Javelle and Matthew Konkol, alleging that they used excessive force in violation of his Fourth Amendment rights. Compl. 7–10. He also brought a negligence claim against the officers and the District of Columbia, alleging that the officers violated a national standard of care by improperly using a tactical "takedown" and applying handcuffs too tightly during his arrest. Compl. 10–11.

The officers filed for summary judgment on the § 1983 claim based on qualified immunity,[1] and the District and officers moved to dismiss the negligence count for failure to state a claim. Defs.' Mot. for Summ. J. & Mot. to Dismiss ("Defs.' Mot.") 1, ECF No. 10. In support of their Motion for Summary Judgment, the officers submitted bodycam footage for

---

[1] This Motion for Summary Judgment is being brought before discovery. The officers base their motion on qualified immunity, which should be resolved at the "earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). When qualified immunity is at issue, "[s]uch pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982)).

three officers on the scene during Elshazli's arrest, including videos from Officers Javelle, Konkol, and Joseph Quinlan. Defs.' Mot., Ex. 1–6.

Based on the video record, no reasonable jury could find that the officers violated Elshazli's Fourth Amendment rights by using excessive force during his arrest. So the officers' Motion for Summary Judgment will be granted. More, because Elshazli fails to state a claim for negligence and because the Court may decline supplemental jurisdiction over the local common law claim, the Court will dismiss Count II of Elshazli's Complaint.

**I.**

According to Elshazli's Complaint, shortly after midnight one morning in early February 2018, he was driving his car when Officers Javelle and Konkol pulled him over. Compl. 4. Elshazli "stopped his vehicle without incident or delay." *Id.* Elshazli alleges that the officers informed him that he had an outstanding arrest warrant in Virginia and then ordered him out of his car. *Id.* Elshazli complied, but "questioned the validity of the warrant and whether or not the Defendant officers had the correct person." *Id.*

"Immediately" after he questioned the warrant, the officers "aggressively tackled" Elshazli to the ground, injuring his left shoulder. *Id.* at 5. While Elshazli lay on the ground, he claims that the officers climbed on top of him and "unnecessarily twist[ed] his left arm . . . causing further injury and pain to his left shoulder." *Id.* He contends he continually questioned why the officers tackled him. *Id.* After the officers handcuffed him, Elshazli alleges that he complained to the officers that the cuffs were too tight. *Id.* They ignored him. *Id.*

Elshazli says he continued to complain about the tightness of the handcuffs and pain in his arm and shoulder after he was placed in the police cruiser. *Id.* After the police booked Elshazli, they took him to Howard University Hospital. *Id.* He was diagnosed with "severe soft

tissue swelling of the elbow" and given painkillers and x-rays. *Id.* at 5–6. Once Elshazli was released from custody, he sought more treatment for his injuries. *Id.* at 6. His doctors recommended he undergo shoulder surgery. *Id.*

But the bodycam video footage submitted by the officers tells a different story. Officers Javelle and Konkol stopped Elshazli's van after discovering that he had an outstanding, extraditable warrant from Virginia. Defs.' Mot., Ex. 1 at 2:03–2:15. The officers approached the van, and Elshazli asked why they stopped him. *Id.* at 2:36–2:37. Officer Javelle promised to "tell him in a second," and asked to see Elshazli's driver's license. *Id.* at 2:44. After confirming Elshazli's identity, Javelle asked Elshazli to step out of the car. *Id.* at 2:53. Elshazli did so, *id.* at 3:01, but, contrary to his Complaint, he did not question the validity of the arrest warrant since the officers had not yet told him that there was a warrant.

The divergence in the stories grows from there. Once the officers and Elshazli reached the back of the van, the officers did not "immediately" or aggressively tackle Elshazli to the ground. Rather, while the officers were standing at the rear of the vehicle, the video shows Konkol taking hold of Elshazli's right wrist. *Id.* at 3:13. Javelle reached for Elshazli's left arm and started to tell him to put his hands behind his back, but Elshazli pulled his arm away. *Id.* at 3:17. At that point, Konkol told Elshazli, "Don't resist," and a moment later, "Stop resisting! Stop resisting!" Defs.' Mot., Ex. 2 at 2:46–2:49. The officers, apparently struggling, turned Elshazli around to face the van and Elshazli placed his right hand against the back windshield. *Id.* at 2:49–2:57. Officer Konkol reached for Elshazli's right hand and began pulling it back. *Id.* at 3:04. But Elshazli yelled, "No, wait a minute!" and pulled his hand away, placing it again on the van. *Id.* at 3:05–3:07. The video then shows a struggle between Elshazli and Konkol as

Konkol tried to peel Elshazli's hand off the back windshield to secure his arm behind his back. *Id.* at 3:07–3:14.

Next, Officer Quinlin pulled up and ran over to where Javelle and Konkol were struggling with Elshazli. Defs.' Mot., Ex. 3 at 2:13–2:20. Quinlin yelled "Put him down! Put him down!" and began moving the other officers' legs to clear a space on the ground. *Id.* at 2:28–2:35. Quinlin then grabbed Elshazli's legs, Javelle and Konkol held Elshazli's arms, and the officers put Elshazli face-down on the ground. *Id.* at 2:36–2:40; Ex. 2 at 3:19–3:22. While on the ground, Elshazli can be seen holding his right hand near his face, Ex. 1 at 4:14, and trying to pull his legs away from Quinlin's grasp, Ex. 3 at 2:49.

Meanwhile, Officer Javelle, kneeling to Elshazli's right, told him to "give us your other arm" and reached for Elshazli's right arm. Ex. 1 at 4:10. Elshazli did not do so. Instead, he again pulled his arm away, trying to tuck it beneath his face or chest. *Id.* at 4:13–4:17. The videos show the officers collectively struggling to prop Elshazli up to pull his hand out from under him. *Id.* at 4:18–4:33; Ex. 2 at 3:58–4:07. The officers repeatedly told Elshazli to "give us your other arm" and to "stop resisting." Ex. 1 at 4:10–4:25. About one and half minutes after initiating the arrest, the video shows one of the officers successfully pulling Elshazli's right arm behind his back and Officer Javelle securing the handcuffs. *Id.* at 4:39–4:55.

## II.

### A.

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is "genuine" if "a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In cases involving allegations of police officers' use of excessive force, "a defendant's motion for summary judgment is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993).

Generally, a court deciding a motion for summary judgment "must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record." *Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999). But not always. There is a "wrinkle" when the record includes a video of the events and the video "quite clearly contradicts the version of the story told by [the plaintiff]." *Scott v. Harris*, 550 U.S. 372, 378 (2007). In *Scott*, video evidence of "a Hollywood-style car chase of the most frightening sort . . . blatantly contradicted" a plaintiff's allegation that he was driving carefully and safely while fleeing police. *Id.* at 380. The Court held there is an obligation to view facts "in the light most favorable to the nonmoving party *only if* there is a 'genuine' dispute as to those facts." *Id.* (emphasis added). But when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

**B.**

A complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hurd v. District of*

5

*Columbia,* 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But a complaint containing only "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" and factually void legal conclusions cannot withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678–79.

## III.

### A.

Elshazli alleges that Officers Javelle and Konkol violated his Fourth Amendment rights by using excessive force while arresting him. Compl. 7–10. The officers seek summary judgment, claiming that they are entitled to qualified immunity on this claim. Defs.' Mot. 6–13. The Court agrees.

Officers Javelle and Konkol are entitled to qualified immunity unless Elshazli can show that (1) the officers violated a constitutional right; and (2) that the right was "clearly established" at the time of the violation. *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014). A case involving use of excessive force during an arrest implicates the Fourth Amendment right to be free from unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Court must apply an "objective reasonableness standard" to determine whether this right has been violated. *Id.* That is, the Court must ask whether, "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," that officer's use of force in this particular case was "reasonable." *Id.* at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.") (cleaned up). The Court determines the reasonableness of an officer's actions based on the "facts and circumstances of each particular case," and considers such factors as "the severity of the crime at issue, whether

6

the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Before determining whether the officers' actions were reasonable here, the Court must determine which set of facts to rely on for purposes of summary judgment. Elshazli's narrative casts himself as a compliant and confused victim. He claims that during a traffic stop, he "did not resist," he repeatedly requested more information from the police about the arrest warrant, and his questions were rewarded with an aggressive and unnecessarily painful arrest. Compl. 4–5, 8.

But the videos reveal a different picture. To be sure, Elshazli may have been confused, but he was certainly not compliant. After Officer Konkol began trying to handcuff Elshazli, Elshazli pulled his arm away several times—ultimately hiding his arm between his body and the ground to prevent the officers from cuffing him. Ex. 1 at 3:17, 4:13–4:17; Ex. 2 at 3:06–3:07. Elshazli shouted "Why?" and "This isn't right!" repeatedly throughout the arrest, but he never told officers that he was trying to comply. Instead, he ignored repeated orders to "stop resisting" and give them his arm. Contrary to Elshazli's contention in his Complaint that the officers tackled him "immediately" after he questioned the warrant, Compl. ¶ 18, the video shows that the officers began by trying to secure Elshazli's arms and only used a takedown after Elshazli repeatedly pulled his arms away and struggled with the officers for more than 30 seconds, Ex. 1 at 3:15–3:50. And even when the officers did take him down to the ground, they were careful to clear the area to prevent injury to Elshazli and themselves. Ex. 3 at 3:19–3:22.

Officers Javelle, Konkol, and Quinlan submitted sworn affidavits attesting to the accuracy of the bodycam footage. Defs.' Mot., Ex. 4–6. Elshazli does not contend that the videos have been altered or edited. Indeed, he agrees with the officers that the videos "fairly and

7

accurately depict the events that resulted in the arrest of Ahmed Elshazli." Defs.' Statement of Undisputed Material Facts ¶ 1, ECF No. 10-1; Pl.'s Response to Defs' Statement of Undisputed Facts ¶ 1, ECF No. 12-1. Elshazli's only objection to the video footage is that it is "not clear as to the actions of the Plaintiff during the arrest." Pl.'s Opp. 7. The Court has carefully reviewed these videos and disagrees. There are numerous instances throughout the videos that plainly show Elshazli pulling his hands, arms, and legs away from the officers' grasp, *see* Ex. 1 at 3:17, 4:13–4:17; Ex. 2 at 3:06–3:07; Ex. 3 at 2:49, flatly contradicting Elshazli's allegation that he "did not resist" arrest, Compl. ¶ 43.

Because trustworthy video footage exists that "blatantly contradicts" Elshazli's story in his Complaint, the Court will rely on the videos in the record rather than Elshazli's narrative to decide the officers' motion. *See Scott*, 550 U.S. at 380. To do otherwise would blinker reality and delay justice for all parties. *Cf. Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (holding that qualified immunity claims must be resolved at the "earliest possible stage in litigation").

Based on this video footage, the Court finds that Officers Javelle and Konkol acted reasonably when they exerted some level of physical force to secure a suspect who was resisting arrest. *See Graham*, 490 U.S. at 386 (stating that an officer may use "some degree of physical coercion" when making an arrest). Even considering Elshazli's age, lack of apparent weapons, and the minor charges underlying the arrest warrant,[2] the officers had little choice but to act as they did when he disobeyed their verbal commands. The D.C. Circuit and other judges of this district have affirmed the reasonableness of officers' use of similar, or even greater, degrees of force while making an arrest. This Court follows their lead.

---

[2] According to the Complaint, the warrant stemmed from an unpaid traffic ticket from Virginia. Compl. ¶ 15.

Consider *Armbruster v. Frost*, in which a video of an arrest showed an officer physically subduing a resisting suspect. 962 F. Supp. 2d 105, 109 (D.D.C. 2013). While the suspect repeatedly "lunged, rotated, and jerked herself away" from the arresting officer, the officer "placed plaintiff on [a] car," "pressed plaintiff back onto the car" when she tried to get up, "brought her to the ground" with other officers when she tried to break free, and then planted "his knee on plaintiff's back for about twenty seconds while placing her in handcuffs." *Id*. at 113–115. The court found that the officer's use of force to subdue a person resisting arrest was "reasonable under the circumstances" and did not "even come close to" excessive force. *Id.* at 113; *see also Cromartie v. District of Columbia*, 479 F. App'x 355, 357 (D.C. Cir. 2012) (concluding that officers used "no more than the ordinary degree of physical coercion used by police officers to effectuate an arrest" when a suspect was "slammed to the ground, handcuffed, and forcibly kept on the ground" by the arresting officers); *Oberwetter v. Hilliard*, 639 F.3d 545, 548, 555 (D.C. Cir. 2011) (finding an officer did not use excessive force in an arrest when he was "ripping apart [the arrestee's] earbud, shoving her against a pillar, and violently twisting her arm").

The officers' conduct here falls well within the spectrum of reasonability. Here, the videos do not show the officers "aggressively tackling" Elshazli without provocation, continuing to exert force on him after they handcuffed him, or intentionally injuring him in any way. The officers only began struggling with Elshazli once he started pulling his arms away from them and refused to comply with their orders. Ex. 1 at 3:17. The takedown occurred only after less extreme efforts to handcuff Elshazli were unsuccessful. *Id.* at 3:13–3:50.[3] And the officers immediately stopped struggling with Elshazli once he was secured in handcuffs. *Id.* at 4:57.

---

[3] Perhaps it would have been preferable for the officers to advise Elshazli that he was under arrest and the basis of the arrest before trying to handcuff him, but then again, there may be good officer safety justifications for not

After Elshazli was handcuffed, the officers sought to pacify him by repeatedly telling him to relax and breathe deeply, *id.* at 7:11–7:50, and by calmly explaining his warrant to him, *id.* at 5:50, 7:50–7:54. These are not the actions of unreasonable, out-of-control officers. By all appearances, the officers used a proportional level of force to secure a suspect who was resisting arrest. Based on this evidence, nothing suggests that the officers exerted force that was so "apparently excessive" that "no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw*, 1 F.3d at 1303. The officers are therefore entitled to qualified immunity and summary judgment will be granted in their favor as to Count I.

**B.**

Elshazli next alleges that Officers Javelle and Konkol, acting within their scope of employment with the D.C. Government, violated a national standard of care by (1) "using a 'take down' when it was not required by the circumstances and by executing it without the required degree of skill and care," and (2) inappropriately applying handcuffs to Elshazli without the requisite degree of skill and care. Compl. 10–11. The District argues that this count should be dismissed for failure to state a claim. Defs.' Mot. 13. According to the District, under local law, Elshazli cannot rely on the same facts underlying a claim for an intentional tort (like those facts supporting Elshazli's excessive force claim) to establish a negligence claim. Defs.' Mot. 13. Alternatively, Defendants urge the Court to use its discretion to decline supplemental jurisdiction over Elshazli's negligence claim. Defs.' Reply 4 n.2.

---

informing a suspect that he is about to be detained. In any event, Elshazli points to no caselaw, and the Court is aware of none, that would require officers to so advise a suspect prior to handcuffing him. *Accord People v. McKinney,* 378 N.E.2d 1125, 1130 (Ill. App. Ct. 1978) (holding defendant could be convicted of resisting arrest even without an officer telling him he was under arrest because a reasonable person "would have perceived the officers' intention to arrest him as they struggled to restrain and handcuff him. . . . Therefore, it was not necessary for the officers to employ the specific words 'You are under arrest,' in order for defendant's arrest to be properly effectuated under the circumstances.").

The District contends that the *District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003), is fatal to Elshazli's negligence claim. In *Chinn*, the D.C. Court of Appeals ("DCCA") held that in cases "involving the intentional use of force by police officers," the trial court should not instruct the jury on a negligence claim unless negligence is "distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care." 839 A.2d at 711. The Court agrees that *Chinn* applies and Elshazli's claim must be dismissed.

Although Elshazli distinctly pleads his excessive force and negligence claims, Elshazli bases both claims on the same facts. His Complaint alleges that during the arrest, "Javelle and Konkol acted intentionally and/or recklessly" when using a tactical takedown to arrest him and handcuffing him too tightly. Compl. 6, 10–11. But under *Chinn*, that is not enough. A plaintiff cannot distinguish his two claims merely by adding words like "standard of care" or "recklessly." *See Chinn*, 839 A.2d at 708. These words, without supporting facts, "are conclusory and do not raise a cognizable claim of negligence." *Id*.

Elshazli alleges no particular facts that distinguish the officers' intentional conduct from their reckless conduct. No facts plausibly suggest that the takedown was anything but an intentional use of physical force. *See* Compl. 4–7; *Kelly v. Gaton*, No. 19-cv-00023-CKK, 2019 WL 2329464, at *3–4 (D.D.C. May 31, 2019) (finding plaintiff's allegation that an officer executed a takedown in a "clumsy and unskillful manner" could not support a negligence claim because the plaintiff "pled no facts which would establish that [the officer's] use of force itself was anything but intentional").

Nor are there allegations that the officers made some mistake of fact or engaged in other reckless conduct while handcuffing Elshazli. Elshazli contends only that the officers "placed the

handcuffs unnecessarily tight on his wrist" and that the officers "ignored Plaintiff's complaints regarding the tightness of the handcuffs." Compl. ¶¶ 21, 23. His Complaint alleges that these facts reveal both that the officers used "excessive force in placing the Plaintiff in handcuffs" and that the officers "violated the national standard of care by the inappropriate application of the handcuffs." [4] Compl. ¶¶ 34, 67. But Elshazli does not point to any distinct factual scenario that supports finding that the officers acted negligently, rather than intentionally. *Cf. Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 28–31 (D.D.C. 2011) (determining that a plaintiff's negligence claim survived the *Chinn* test when he alleged that the officer "either intentionally or recklessly failed to lock the handcuffs" because he alleged a "possible misperception of fact").

Elshazli responds that even if his negligence claim would be barred by *Chinn*, *Chinn* does not prohibit alternative claims from being pled in a complaint but governs only which claims may be submitted to the jury. Pl.'s Opp. 7–8. But the weight of the caselaw is against him. While *Chinn* was decided post-jury verdict, the DCCA has also applied *Chinn*'s reasoning to assess the adequacy of plaintiffs' pleadings in a motion to dismiss. *See Stewart-Veal v. District of Columbia*, 896 A.2d 232, 235 (D.C. 2006).

In *Stewart-Veal*, the court, citing *Chinn*, affirmed that the plaintiff had failed to state a negligence claim because she had not shown how the claim was "separate and distinct from [her] false arrest claim." *Id.* Although "the same course of conduct may support both" an intentional

---

[4] Elshazli's Opposition to the officers' motion seems to shift the characterization of his negligence claim from the officers' "inappropriate application of the handcuffs," Compl. ¶ 67, to alleging that the officers "failed to address his complaints regarding the tightness of the handcuffs," Pl.'s Opp. 8. The Court cannot consider this new basis for Elshazli's negligence claim because "Plaintiff is not permitted to advance a claim in his Motion and Opposition that was not alleged in his Complaint." *Richardson v. Capital One, N.A.*, 839 F. Supp. 2d 197, 202 (D.D.C. 2012); *see also Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (quoting *Morgan Distributing Co., Inc. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989)).

tort and negligence, the plaintiff was still required to allege facts in her complaint that the defendant was "breaching another recognized duty owed to the plaintiff" and not "merely recharacterize[ing]" an intentional claim as negligence. *Id.* at 235–36 (internal quotations removed). Elshazli's Complaint does not clear this bar.

Other judges in this district have also applied *Chinn* to assess the adequacy of plaintiffs' pleadings. *See, e.g.*, *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 46 (D.D.C. 2015); *Hargraves v. District of Columbia*, No 12-cv-1459-BAH, 2013 WL 12333597, at *2 (D.D.C. July 3, 2013); *Hall v. Lanier*, 708 F. Supp. 2d 28, 31–32 (D.D.C. 2010); *Rice v. District of Columbia*, 715 F. Supp. 2d 127, 131–32 (D.D.C. 2010). Because Elshazli fails to plead any facts that would distinguish the officers' use of excessive force from their allegedly negligent conduct, his negligence claims must be dismissed. *See Lucas v. District of Columbia*, 505 F. Supp. 2d 122, 126–27 (D.D.C. 2007) (dismissing plaintiff's negligence claim because "any negligence claim must be based on facts that are different from the alleged excessive force").

Even putting *Chinn* aside, the Court would dismiss Elshazli's negligence claim based on its authority to decline supplemental jurisdiction. Because the Court will grant summary judgment on the only federal claim here, the Court may decline to exercise supplemental jurisdiction over Elshazli's remaining common law claim.[5] *See* 28 U.S.C. § 1367(c)(3) ("A district court may decline to exercise supplemental jurisdiction over [claims outside of its original jurisdiction] if . . . the district court has dismissed all claims over which it has original jurisdiction."). Generally, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy,

---

[5] Elshazli, as a Virginia resident, Compl. ¶ 7, may have been able to bring this case under the Court's diversity jurisdiction. *See* 28 U.S.C. § 1332(c). But he does not invoke it, *see* Compl. ¶¶ 3–6, nor does he plead the citizenship of the individual officers and thus has not established that complete diversity of citizenship exists. *See Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 93 (D.D.C. 2010).

convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

That is the case here. There is no apparent difference in convenience for the parties by litigating this case in local versus federal court. Elshazli will not be prejudiced by the dismissal because the statute of limitations for any claim over which this Court had supplemental jurisdiction is tolled while the case has been pending and for thirty days after the claim is dismissed. *See* 28 U.S.C. § 1367(d). As for judicial economy, this case has only been pending here for a short time and the parties have invested no resources in discovery. Finally, because Elshazli's negligence claim raises an issue of D.C. common law, this case presents a local issue that would be better resolved by local jurists. *See Dyson v. District of Columbia*, 808 F. Supp. 2d 84, 88–89 (D.D.C. 2011) (declining supplemental jurisdiction over claims arising from D.C. law because "the remaining issues are best resolved by the state court"). The Court will, then, dismiss Elshazli's negligence claim without prejudice so that he may bring the claim in the Superior Court for the District of Columbia.

**IV.**

For all these reasons, Officers Javelle and Konkol's Motion for Summary Judgment on Count I of the Complaint will be granted. Count II of the Complaint is hereby dismissed without prejudice. A separate order will issue.

Dated: November 21, 2019                                    TREVOR N. McFADDEN, U.S.D.J.